Grant v. Hyatt et al.

No. 2239.—DAVID GRANT *v.* R. C. HYATT et al.

In this case it appears from the evidence, that A & B owned the Pelican mills in partnership; that in operating said mills they were commercial partners; that C, a third party, loaned A, one of the partners, an amount of money for the use and on account of the partnership, and to be paid by the partnership funds. C brought suit against the partnership for the amount of money loaned, and A, one of the partners, confessed judgment. Execution issued on the judgment thus confessed, and the mill, the partnership establishment, was seized. B, the other partner, enjoined the sale. Held—That the judgment having been confessed by one of the partners, for a partnership debt, before the dissolution thereof, the sale of the partnership property could not be restrained by injunction taken out by the other partners.

APPEAL from Fourth District Court, parish of Orleans. *Théard,* J. *T. A. Bartlette,* for plaintiff and appellant. *Breaux & Fenner,* for defendant and appellee.

TALIAFERRO, J. The defendant, Hyatt, having seized under a writ of *fieri facias* the establishment called the "Pelican Mills," the plaintiff restrained the sale of the property by a writ of injunction, which is the basis of this action. He avers that neither he nor the Pelican mills owe Hyatt any thing, and that the proceeding had its origin in a conspiracy and fraud between the latter and McGibbon, a party having an interest in the mills, to injure the plaintiff.

In the court below the injunction was dissolved, and the plaintiff appealed.

The case depends mainly on questions of fact. These seem to be:

*First*—Was there a partnership between Grant, the plaintiff, and McGibbon; and, if so, was the partnership a commercial one?

*Second*—Was the partnership dissolved at the time McGibbon confessed judgment in the suit of Hyatt against Grant and McGibbon, and upon which judgment the *fieri facias* issued?

*Third*—Was the money furnished by Hyatt to go for McGibbon's part of the capital to be furnished by him upon entering into the partnership with Grant, or was it simply money advanced to the partnership to enable it to buy lumber?

We think the evidence fully establishes that a partnership existed between Grant and McGibbon. The latter had purchased the undivided interest of Young, a former partner of Grant in the establishment. Grant, although denying a partnership between himself and McGibbon, says, in his own testimony: "in regard to profits to be made, my arrangements with McGibbon was not particularly mentioned. There was to be a division of the profits between us; they were to be equally divided." He acknowledges to the witness Lousse, that McGibbon was his partner in the mill. McGibbon in his testimony, says: "The profits and losses were to be divided in equal parts between us; the association was verbal." It is also shown that the business carried on was principally that of buying lumber in the rough state, planing and dressing it, and selling it in that condition. The partnership was therefore a commercial one. 3 Rob. 130; 6 An. 709; 11 An. 615.

It seems that this establishment did not do a thriving business for want of means to carry on the business advantageously. Young, the former partner of Grant, sold out his undivided interest in the mills for the reason that there was a want of capital to make the business profitable.. Hyatt, the defendant, furnished money at different times, for the establishment, and for the repayment of which he sued Grant and McGibbon ; and in this suit, McGibbon confessed judgment against the partnership. Grant labors to establish that the money furnished by Hyatt was furnished to McGibbon, and was McGibbon's share of capital to be furnished by him. Upon the books of the establishment the several sums of money advanced by Hyatt are placed to McGibbon's credit, under the head of capital. Hyatt's name does not appear upon the books either as creditor or debtor. There is an irreconcilable discrepancy between the round assertions of Grant, in his own testimony, and the statements of McGibbon in his. The former asserts that McGibbon told him he had twenty thousand dollars, for which he was getting no interest ; that McGibbon was first to put in $3000, and then $3000 more in a few days. He states that McGibbon put in $2000, and that it was paid in lumber bills to Chandler, Delmas and Griffin. McGibbon says that this statement of Grant in regard to the twenty thousand dollars is false, and that he never told Grant that he would put in $2000, and in a few days after $3000. He says : " I never promised to furnish any capital ; I told him that if the business proved successful and paid well, by May I would let him know what I would do." McGibbon, it seems, was induced to purchase Young's interest in the mills at the solicitation of Grant, with whom he was on terms of intimacy, having boarded in his family for a number of years. Previous to the purchase of Young's interest in the establishment, McGibbon had loaned Grant money to assist him in his operations. He states in his testimony that after purchasing Young's interest Grant expressed himself grateful to him for releasing him from his embarrassments with Young, and said that he would devote all his time and attention to the mill without making any charge for his services, the profits to be equally divided between us. Both McGibbon and Hyatt state that they were ignorant of the entries on the books being placed to the credit of McGibbon. We think it entirely clear that Hyatt, upon the credit of McGibbon, advanced money for the benefit of the partnership ; he expected to get his money back out of the proceeds of sale of the planed and prepared lumber. That this was the understanding, it seems plain from the fact that for one of the bills of lumber purchased through Hyatt, the latter was reimbursed by partnership funds paid to him by Grant; and that Grant afterwards, as the active partner of the concern, when called upon to pay the other advances made by Hyatt, made no objection to doing so, but promised to pay them as soon as he was in funds, and afterwards proposed to Hyatt to mortgage his

Grant v. Hyatt et al.

interest in the mill to secure the payment of $1600 of the debt due to Hyatt.

There was no written instrument showing the terms of the partnership. It is not shown that McGibbon was to furnish any amount as capital to be put in by him. Through the credit alone which he gave the partnership it was enabled to procure money to carry on its operations, and we think the evidence warrants the inference that McGibbon was influenced, in part, in going into the copartnership, by considerations of personal regard to Grant. Though not the business man of the concern, yet he procured the advances so much needed, and it is shown that there were frequent conferences between himself and Grant in relation to the partnership.

It is argued that the partnership was dissolved before the suit was brought against it, and consequently, that McGibbon was without authority to act for it, and that his confession of judgment in the suit of Hyatt against the partnership, was null and without effect.

We do not find from the evidence that the partnership was terminated before the suit of Hyatt was instituted. Some dissatisfaction on the part of McGibbon in regard to the affairs of the establishment prior to that time, and some intimations of an intention on his part to withdraw from it are shown; but there is nothing showing a dissolution previous to the suit being brought. McGibbon says that the establishment was not closed until October, 1867, and the engineer, Halley, stated as a witness, that the last time he saw Grant purchase lumber was six or eight months previous to the time he testified, which was in the early part of June, 1868.

A careful examination of the evidence does not satisfy us that there is error in the judgment appealed from.

It is therefore ordered, adjudged and decreed that the judgment of the district court be affirmed, with costs in both courts.